UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH LEE TAYLOR, | No.  2:21-01042 TLN SCR P |
| Plaintiff, | |
| v. | FINDINGS & RECOMMENDATIONS |
| MARSHA INGRAM, et al., | |
| Defendants. | |

Plaintiff is a former state prisoner proceeding pro se with a civil rights action under 42 U.S.C. § 1983.  Before the court is defendant Ingram's motion for summary judgement on plaintiff's First Amendment retaliation claims.  (ECF No. 58.)  Ingram is the sole remaining defendant in the case.  For the reasons set forth below, the undersigned recommends that defendant's motion be granted in part and denied in part as follows:

     1)    Defendant's motion be granted as to plaintiff's claims premised on the alleged retaliatory Counseling Only Rules Violation Report and housing reassignment; and

     2)    Defendant's motion be denied as to plaintiff's claim premised on defendant's alleged threat to reassign plaintiff's housing assignment.

////

////

////

1

**BACKGROUND**

**I.        Allegations in the Complaint**

This case proceeds on plaintiff's complaint filed on June 14, 2021.  (ECF No. 1.)  The complaint named Correctional Officer ("C/O") M. Ingram and Correctional Sergeant R. Valencia as defendants. (Id. at 2.)  On August 4, 2019, plaintiff made several requests for defendant Ingram to mail his outgoing legal mail.  (Id. at 4.)  Defendant Ingram denied these requests and "started yelling emotionally at him out of control with extreme vulgarity." (Id.)  When defendant Ingram informed plaintiff that she would not assist with his mail, plaintiff informed her that he intended to "write a complaint against her" for her refusal.  (Id. at 5.)  In response, defendant Ingram threatened "to move plaintiff out of her housing unit." (Id.) C/O C.  Dubuisson intervened and ordered plaintiff back to his cell, later telling plaintiff that "you can never win an argument with the defendant (c/o Marsha Ingram) because of what she'll write on paper."  (Id.)

Defendant Ingram wrote plaintiff up for a "false and fabricated" rules violation based on this interaction.  (ECF No. 1 at 6.)  Defendant Ingram also moved plaintiff from his "Honor Housing Unit Dormitory" to a housing unit with a water supply contaminated with Legionnaire's Disease.  (Id. at 6.)  As a result of being placed in the new housing unit, plaintiff "contracted and suffered 'skin rashes all over his body that's permanent to this date.'" (Id. at 7.)  Defendant Valencia approved the order for plaintiff to be moved to a different housing unit.  (Id. at 6.)

Plaintiff's alleged injuries include damage to his disciplinary history for his upcoming parole hearing, medical consequences including emotional distress, and loss of preferred living environment.  (ECF No. 1 at 4.)  Plaintiff asks that defendant issue a "chrono" stating her rules violation report was meritless and seeks monetary damages in an unspecified amount.  (Id. at 8.)

**II.       Procedural History**

Judge Barnes, the previously assigned magistrate judge, screened in a First Amendment retaliation claim against defendant Ingram based on her (1) filing a "false and fabricated" rules violation report; and (2) transferring plaintiff to another housing unit.  (ECF No. 7.)  Judge Barnes found plaintiff did not state any cognizable claims against Valencia.  (Id. at 6-7.)  Plaintiff elected to proceed on his cognizable claims against defendant Ingram rather than amend.  (ECF No. 10.)

1    Defendant answered the complaint on October 14, 2022. (ECF No. 24.)  On January 30,

2    2023, defendant filed a motion for partial summary judgment on grounds plaintiff failed to

3    exhaust his claim premised on defendant's alleged retaliatory housing assignment. (ECF No. 26.)

4    Judge Barnes determined administrative remedies were effectively unavailable to plaintiff and

5    recommended defendant's motion be denied. (ECF No. 45.)  Judge Nunley adopted the findings

6    and recommendations in full and denied defendant's motion. (ECF No. 51.)  Defendant filed the

7    instant motion on May 3, 2024. (ECF No. 58.)  The motion is fully briefed.

8                    **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

9    **I.      Filings Related to Defendant's Motion**

10           **A. Defendant's Motion for Summary Judgment**

11    Defendant asserts that plaintiff cannot prove the essential elements of retaliation. She

12    argues plaintiff's claim based on the falsified rules violation fails as a matter of law because

13    counseling-only "chronos" do not constitute an adverse action for retaliation purposes. (ECF No.

14    58 at 13-16.)  Defendant contends that plaintiff's claim premised on the alleged retaliatory bed

15    assignment fails for lack of causation because she was not involved in the move itself. (Id. at 20-

16    21.)  In the alternative, defendant claims she is entitled to qualified immunity. (Id. at 16-17.)

17           **B. Plaintiff's Opposition**

18    In opposition, plaintiff argues his "sudden bed movement" four days after the altercation

19    with defendant Ingram evince a "chain and civil conspiracy" against him. He alleges the housing

20    reassignment was adverse and conducted in violation of prison rules. (ECF No. 74 at 2-3.)  He

21    submits the sworn declarations of five inmates attesting to his original unit as "honor housing"

22    only for those with no CDCR-115 serious rule violations in the past year. (Id. at 7-16.)

23    Plaintiff did not reproduce defendant's itemized statement of undisputed facts (ECF No.

24    58-1) and identify which are admitted and which are disputed as required by Local Rule 260(b).

25    "Pro se litigants must follow the same rules of procedure that govern other litigants." King v.

26    Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987) (citation omitted), overruled on other grounds, Lacey v.

27    Maricopa County, 693 F.3d 896, 928 (9th Cir. 2012) (en banc).  However, it is well-established

28    that district courts are to "construe liberally motion papers and pleadings filed by pro se inmates

3

1   and should avoid applying summary judgment rules strictly." <u>Thomas v. Ponder</u>, 611 F.3d 1144,

2   1150 (9th Cir. 2010).  Accordingly, the court considers the record before it in its entirety despite

3   plaintiff's failure to strictly comply with the Local Rules.  <u>See</u> Adv. Comm. Note to 2010

4   Amendments to Fed. R. Civ. P. 56(e)(4) ("[T]he court may seek to reassure itself by some

5   examination of the record before granting summary judgment against a pro se litigant.").

6          However, the court will only consider those assertions in plaintiff's opposition that have

7   evidentiary support in the record.  A party's mere claim that a matter is "disputed" does not

8   suffice to dispute a fact that is supported by competent evidence.  <u>See</u> <u>Coverdell v. Dep't of Soc.</u>

9   <u>& Health Servs.</u>, 834 F.2d 758, 762 (9th Cir. 1987) (recitations of unsworn factual allegations do

10  not adequately oppose competent evidence presented in a motion for summary judgment); <u>Burch</u>

11  <u>v. Regents of Univ. of California</u>, 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006) ("statements in

12  declarations based on speculation or improper legal conclusions, or argumentative statements, are

13  not facts and likewise will not be considered on a motion for summary judgment").[1]

14          **C.  Defendant's Reply**

15         On reply, defendant reiterates the arguments in her motion and asserts that plaintiff has no

16  evidence to support a conspiracy to move his bunk.  She counters the alleged "honors unit" was

17  not classified as such by CDCR and in fact was no different than other units.  As such, neither

18  defendant's threat to move plaintiff nor the move itself can be adverse.  (ECF No. 79 at 5-6.)

19  **II.    Material Facts[2]**

20          **A.  Incident on August 4, 2019**

21         In August of 2019, plaintiff was housed at California Health Care Facility ("CHCF") -

---

[1]  The court will also allow plaintiff to use his sworn complaint as an opposing affidavit.  A complaint submitted in substantial compliance with the form prescribed in 28 U.S.C. § 1746 is a "verified complaint" and may serve as an opposing affidavit under Rule 56 if its allegations arise from personal knowledge and contain specific facts admissible into evidence.  <u>See</u> <u>Jones v. Blanas</u>, 393 F.3d 918, 923 (9th Cir. 2004); <u>Schroeder v. McDonald</u>, 55 F.3d 454, 460 (9th Cir. 1995) (accepting the verified complaint as an opposing affidavit because the plaintiff "demonstrated his personal knowledge by citing two specific instances where correctional staff members . . . made statements from which a jury could reasonably infer a retaliatory motive").

[2]  The material facts are based on defendants' Statement of Undisputed Facts (ECF No. 58-1) with plaintiff's dispute noted where evident from the record.

4

1    Facility E in E 302A Housing Unit.  Defendant Ingram was assigned to work in that unit.

2    (Defendant's Statement of Undisputed Facts ("SUFs") 2, ECF No. 58-1 at 2.)  On August 4,

3    2019, during third watch, at approximately 1730 hours, defendant was working in the Unit E

4    302A dayroom at the podium performing her assigned work tasks, which included preparation for

5    and monitoring inmates at mealtime (chow).  Plaintiff approached defendant and asked about

6    having his legal mail processed.  Defendant told him she was busy, and she would do his mail for

7    him after she was done with administering and supervising chow.  (SUF 3.)  Plaintiff

8    subsequently came up to defendant on two additional, separate occasions to request that his legal

9    mail be processed while defendant was still busy administering and supervising inmates in the E

10    302A Housing Unit during chow.  Defendant told plaintiff that she was still busy each time.

11    (SUF 4.)

12         At about 1845 hours, defendant called plaintiff up to process his mail.  Defendant claims

13    she counseled plaintiff on his rude behavior and about waiting until she was not busy performing

14    other duties to process his mail.  Plaintiff was disrespectful and shouted, "I have the right to have

15    my fucking mail done."  (SUF 5.)  Plaintiff claims defendant "started yelling emotionally at him

16    with extreme vulgarity" when he approached.  He told her he was following her orders to return

17    and apologized for the misunderstanding.  Only when defendant continued to yell did plaintiff

18    shout, "I have the right to have my fucking mail done."  (ECF No. 1 at 4-5; Pltf. Dep. 53:6-14,

19    ECF No. 58-8 at 27.)  Plaintiff then informed defendant he was going to write a complaint against

20    her for refusing to process his mail.  In response, defendant threatened to move plaintiff out of her

21    unit.  (ECF No. 1 at 4-5; see also Declaration of H. Ervin ("Ervin Decl."), ECF No. 74 at 8.)

22         Officer Dubuisson arrived around the same time.  He characterizes plaintiff's behavior as

23    "disrespectful" and "abusive" towards defendant.  (SUF 6.)  Dubuisson heard plaintiff threaten to

24    file a complaint against defendant.  (Declaration of C. Dubuisson ("Dubuisson Decl.") ¶ 6, ECF

25    No. 58-3 at 2.)  But both Dubuisson and defendant deny that she cursed at plaintiff or threatened

26    to move him from his bunk.  (SUF 7-8.)  Dubuisson told plaintiff to cool down, stop arguing, and

27    return to his bunk.  He processed plaintiff's mail later that night.  (SUFs 9, 18.)

28    ////

5

1

### B. Counseling Only Rules Violation Report

2    That same night, at 1930 hours, defendant filed a Counseling Only Rules Violation Report

3    ("RVR") (also known as a "Form 128A") against plaintiff, RVR Log 6885562, for a violation of

4    Rule 3004(b)(01) – Disrespect without the potential for violence/disruption. (SUFs 13-14.)

5    Defendant states the RVR was warranted based on plaintiff's history of sexist, hostile, and

6    verbally abusive conduct toward her, and consistent with prison regulations. (SUFs 8, 10-12, 17.)

7    Because only a counseling chrono was issued, no punishment was imposed. (SUF 15.)

8

### C. Housing Unit Reassignment

9    On August 8, 2019, four days after the parties' altercation, C/O D. Yang and C/O P. Nine

10    agreed to "flip flop"[3] plaintiff's bed assignment with an inmate named Miranda, who was having

11    compatibility issues in his housing unit E 305A. (SUF 20.) The request was approved by Sgt.

12    Valencia. (Id.) Defendant did not request the move, was not asked about it, and was unaware of

13    its circumstances until reviewing the declarations filed with this motion. (SUFs 21-22.)

14    Plaintiff disputes the "flip flop" and claims defendant reassigned his housing in retaliation

15    for his threat to file a grievance. (SUF 19.) Plaintiff, through his own testimony and supporting

16    declarations of five inmates, attests that E 302A was an "honor unit" run by defendant for those

17    without "CDCR 115s" in the past year. (ECF No. 55 at 3-4; Pltf. Dep. 44:21-23, ECF No. 58-8 at

18    25; ECF No. 74 at 7-16.) Unit E 302A was the only unit plaintiff had been assigned to since his

19    medical transfer from Solano State Prison around September 1, 2018, and the transfer caused him

20    a loss of positive companionship and opportunities to rehabilitate. (Pltf. Dep. 108:6-17, ECF No.

21    58-8 at 41; ECF No. 74 at 5.) The unit plaintiff was reassigned to, "Building 5A," was known as

22    the "ghetto" and was contaminated with Legionnaires' Disease that caused him debilitating rashes

23    and itching. (ECF No. 55 at 5-6; Pltf. Dep. 108:18-25, ECF No. 58-8 at 41; ECF No. 1 at 6-7.)

24

### D. Parole Hearing

25    Plaintiff's first parole hearing after the incident with defendant took place in July of 2021.

26    (SUFs 25, 28.) Plaintiff's parole was denied. (SUFs 31-32.) The board's decision mentioned the

27

28

---

[3] The term "flip-flop" is commonly used within the institution to signal that two inmates are switching bed assignments with one another. (SUF 20.)

1   counseling chrono defendant issued once: "[Y]ou have your institutional behavior has been 115

2   free since 2011, but there is a 128-A as recently as 2019 for disrespect. Uh, during our

3   discussions today, you failed to take responsibility for any negative behavior."  (SUF 29.)

4       The Parole Board noted the information that it considered in making its decision:

5       In determining whether the inmate poses an unreasonable current risk to public
        safety, we considered the following, the comprehensive risk assessment,
6       electronic central file, additional documents, submitted, letters and responses, the
        testimony presented at the hearing by Mr. Taylor, as well as the input of Deputy
7       District Attorney and prisoner's attorney.

8
9   (SUF 30.)  In issuing its decision, the board stated:

10      At this time, the Panel finds that Mr. Taylor is not suitable for parole and does
        pose an unreasonable risk of current danger to society, if released. In considering
11      the entire record, the Panel determined there is a rational nexus between the
        evidence and the ultimate determination of current dangerousness. Keeping an[d]
12      applying all legal standards applicable to life parole consideration hearings in
        mind, the Panel finds that the aggravating factors presently outweigh the
13      mitigating factors in this case.

14  (SUF 31.)  The aggravating factors the board considered in denying parole included: (1) the

15  circumstances surrounding the violent attack on plaintiff's victim, which left her hospitalized; (2)

16  that "as much as [Taylor] den[ies] causing [the victim] any harm, she was harmed a lot[;]" (3) the

17  crime "show[ed] a callous disregard for human life and suffering, it was cruel, dispassionate, and

18  calculated;" and (4) current aggravating dynamic factors indicating a current dangerousness,

19  including that his understanding of his criminal actions is "woefully lacking."  (SUF 32.)

20                    **LEGAL STANDARDS FOR SUMMARY JUDGMENT**

21      Summary judgment is appropriate when it is demonstrated that there "is no genuine

22  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

23  Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden

24  of proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litig., 627

25  F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The

26  moving party may accomplish this by "citing to particular parts of materials in the record,

27  including depositions, documents, electronically stored information, affidavits or declarations,

28  stipulations (including those made for purposes of the motion only), admissions, interrogatory

1   answers, or other materials" or by showing that such materials "do not establish the absence or

2   presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

3   support the fact." Fed. R. Civ. P. 56(c)(1).

4          "Where the non-moving party bears the burden of proof at trial, the moving party need

5   only prove that there is an absence of evidence to support the non-moving party's case." Oracle

6   Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).

7   Indeed, summary judgment should be entered, "after adequate time for discovery and upon

8   motion, against a party who fails to make a showing sufficient to establish the existence of an

9   element essential to that party's case, and on which that party will bear the burden of proof at

10  trial." Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element

11  of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. In such

12  a circumstance, summary judgment should "be granted so long as whatever is before the district

13  court demonstrates that the standard for the entry of summary judgment, as set forth in Rule

14  56(c), is satisfied." Id.

15         If the moving party meets its initial responsibility, the burden then shifts to the opposing

16  party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec.

17  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the

18  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

19  of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

20  admissible discovery material, in support of its contention that the dispute exists. See Fed. R.

21  Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a

22  fact "that might affect the outcome of the suit under the governing law," and that the dispute is

23  genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving

24  party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

25         In the endeavor to establish the existence of a factual dispute, the opposing party need not

26  establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

27  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

28  trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce

8

1    the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

2    Matsushita, 475 U.S. at 587 (quoting Adv. Comm. Note to 1963 Amendments to Fed. R. Civ. P.

3    56(e)).

4        In resolving the summary judgment motion, the evidence of the opposing party is to be

5    believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the

6    facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475

7    U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

8    obligation to produce a factual predicate from which the inference may be drawn.  See Richards

9    v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

10   (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

11   simply show that there is some metaphysical doubt as to the material facts....  Where the record

12   taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

13   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

14                                       **DISCUSSION**

15   **I.     Plaintiff's Legal Boxes**

16        After his release from CHCF in November 2024, plaintiff sought an extension of time to

17   oppose defendant's motion because his legal boxes were still stored in the facility's Patient

18   Management Unit ("PMU").  (ECF No. 70.)  Defense counsel responded that CHCF had nine of

19   plaintiff's boxes and gave him instructions on how to retrieve his property. (Declaration of PMU

20   Sgt. L. Steele ¶¶ 2-3, ECF No. 71-2 at 2.).  The undersigned granted plaintiff an extension and

21   encouraged him to contact the appropriate PMU staff.  (ECF No. 72.)

22        In his opposition (ECF No. 74 at 5-6) and two supplemental letters filed with the court

23   (ECF Nos. 77, 78), plaintiff claims he has only received six of his legal boxes.  Plaintiff states the

24   remaining boxes in the PMU's possession contain documents related to this action.  (See ECF No.

25   78 at 2.)  On April 25, 2025, the undersigned ordered defense counsel to inquire with the CHCF

26   litigation coordinator regarding the status of plaintiff's boxes and file a declaration informing the

27   court whether the boxes have been provided to plaintiff.  (ECF No. 80.)  The Litigation

28   Coordinator responded that an updated property log showed the PMU had only six of plaintiff's

                                                9

1   boxes, not nine, and that all six have been mailed to, and received by, plaintiff.  (Declaration of E.

2   Campos ¶¶ 3-4, ECF No. 81 at 2.)  The PMU no longer has any of plaintiff's property.  (Id. ¶ 4.)

3   Thus, at this time, this court will take no further action regarding plaintiff's boxes.

4   **II.       Evidentiary Issues**

5          Defense counsel states plaintiff did not timely respond to the requests for admissions

6   ("RFAs"), and as a result "they are deemed admitted and included as admissions in the

7   Defendant's [SUFs]."  (Declaration of Diane de Kervor ("de Kervor Decl.") ¶ 3, ECF No. 58-8 at

8   2.)  Several of the RFAs cited in defendant's SUFs are central to plaintiff's theory of the case

9   (see, e.g., RFA No. 17 ("Admit that there is no 'Honor Housing Unit Dormitory,' as that term is

10  used in the complaint, at the prison")) or dispositive as to elements of his retaliation claim (see,

11  e.g., RFA No. 34 ("Admit that there was no retaliatory motive for your August 8, 2019 bed

12  move")).  (Id., Exh. A, ECF No. 58-8 at 7-9; SUF 23, ECF No. 58-1 at 11.)  Thus, if deemed

13  admitted, the RFAs would likely result in summary judgment in defendant's favor.

14         Under Federal Rule of Civil Procedure 36(a)(3), a matter is admitted unless the party to

15  whom the request is directed timely serves on the requesting party a written answer or objection

16  addressed to the matter and signed by the party or its attorney.  Here, defendant served the RFAs

17  and other discovery requests on January 13, 2023, and plaintiff did not respond within forty-five

18  days as required by the court's discovery and scheduling order.  (de Kervor Decl. ¶ 3, ECF No.

19  58-8 at 2; ECF No. 25 at 5.)  "Failure to timely respond to requests for admissions results in

20  automatic admission of the matters requested.  No motion to establish the admissions is needed

21  because Federal Rule of Civil Procedure 36(a) is self executing."  F.T.C. v. Medicor LLC., 217 F.

22  Supp. 2d 1048, 1053 (C.D. Cal. 2002) (internal citations omitted).

23         While plaintiff did not timely respond to the RFAs, the record shows he made some effort

24  to deny their substance before defendant moved for summary judgment.  On April 24, 2023, he

25  submitted the Ervin Declaration attesting to E 302A as "honor housing" (ECF No. 33) and later

26  mailed his untimely RFA responses to defense counsel on July 25, 2023 (de Kervor Decl. ¶ 7,

27  ECF No. 43-1 at 2).  Under similar circumstances, courts have elected to resolve motions for

28  summary judgment "on the evidence presented by the parties" rather than on facts deemed

1    admitted pursuant to Rule 36(a)(3). <u>F.T.C.</u>, 217 F. Supp. 2d at 1053; <u>see also</u> <u>Douglas v. Stevens</u>,

2    No. 2:09-cv-3412 KJM GGH PC, 2011 WL 3555703, at *13 (E.D. Cal. Aug. 11, 2011) (declining

3    to resolve motion for summary judgment on deemed admissions that the pro se plaintiff "made at

4    least some reasonable effort to deny"), <u>report and recommendation adopted</u>, No. CIV S-09-3412

5    KJM GGH PC (E.D. Cal. Sept. 28, 2011).  Thus, the undersigned finds it appropriate to resolve

6    the motion on the evidence rather than on the deemed admissions.

7        **III.    First Amendment Retaliation**

8        "Within the prison context, a viable claim of First Amendment retaliation entails five

9    basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2)

10   because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

11   exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate

12   correctional goal." <u>Rhodes v. Robinson</u>, 408 F.3d 559, 567-68 (9th Cir. 2005) (citations and

13   footnote omitted).

14       Plaintiff's statement to defendant that he intended to file a complaint against her was

15   protected conduct.  <u>See</u> <u>Hackworth v. Arevalos</u>, No. 1:19-cv-1362 ADA CDB PC, 2022 WL

16   18027835, at *6 (E.D. Cal. Dec. 30, 2022) ("Threatening to file an inmate grievance is also

17   protected activity"), <u>report and recommendation adopted,</u> No. 1:19-CV-1362 ADA CDB PC,

18   2023 WL 2751532 (E.D. Cal. Mar. 31, 2023); <u>see also</u> <u>Entler v. Gregoire</u>, 872 F.3d 1031, 1039

19   (9th Cir. 2017) (threats to sue fall within the purview of the constitutionally protected right to file

20   grievances).  The court will address each of defendant's alleged retaliatory responses in turn.

21       **A.  Counseling Only RVR**

22       The first element of a retaliation claim requires plaintiff to prove defendants took adverse

23   action against him.  <u>Rhodes</u>, 408 F.3d at 568.  Though an adverse action need not be an

24   independent constitutional violation, inconsequential or *de minimis* harms do not suffice.

25   <u>Watison v. Carter</u>, 668 F.3d 1108, 1114 (9th Cir. 2012) (to support a claim a harm must be "more

26   than minimal") (citations omitted).  A retaliation claim may assert an adverse action "no more

27   tangible than a chilling effect on First Amendment rights."  <u>Brodheim v. Cry</u>, 584 F.3d 1262,

28   1269–70 (9th Cir. 2009) (quoting <u>Gomez v. Vernon</u>, 255 F.3d 1118, 1127 (9th Cir. 2001)).

1    Defendant argues that plaintiff's retaliation claim premised on her RVR fails because a
2    counseling chrono is not an "adverse action."  (ECF No. 58 at 7.)  A counseling chrono, codified
3    as a "Counseling Only RVR" in CDCR's regulations, is issued when "similar minor misconduct
4    reoccurs after verbal counseling or if documentation of minor misconduct is needed."  Cal. Code
5    Regs. tit. 15, § 3312(a)(2).[4]  Unlike an RVR, which is issued when "misconduct is believed to be
6    a violation of law or is not minor in nature," a Counseling Only RVR does not require that any
7    disciplinary action be taken.  See Cal. Code Regs., tit. 5, § 3312(a)(2)-(3).

8    As defendant notes, "numerous district courts within the Ninth Circuit have concluded
9    that informational and counseling chronos do not constitute adverse actions."  Vallery, 2020 WL
10    7425343, at *4 (quoting Heilman v. Furster, No. CV 15-9987 JVS (FFM), 2018 WL 2588900, at
11    *11 (C.D. Cal. May 1, 2018), report and recommendation adopted, No. CV 15-9987 JVS (FFM),
12    2018 WL 2472891 (C.D. Cal. May 31, 2018)).  However, a counseling chrono may constitute an
13    adverse action if its issuance causes a separate, concrete harm.[5]  See Clemente v. Stinson, No.
14    2:19-cv-0789 MCE JDP PC, 2022 WL 584210, at *4 (E.D. Cal. Feb. 25, 2022) (informational
15    counseling chrono had "direct and harmful consequence" of denial of plaintiff's application for
16    single-cell status); Brown v. Chothia, No. 1:19-cv-0352 DAD EPG PC, 2021 WL 2913076, at
17    *13 (E.D. Cal. July 12, 2021) (rejecting proposition that "only formal discipline" from a
18    counseling chrono may constitute an adverse action), report and recommendation adopted, No.
19    1:19-cv-0352 DAD EPG PC, 2021 WL 4132341 (E.D. Cal. Sept. 10, 2021).

20

21    _____
[4]  CDCR introduced the "Counseling Only Rules Violation Report" in its 2016 amendments to
22    the Title 15 regulations.  Prior to the amendment, minor misconduct was documented on a
"Custodial Counseling Chrono," referred to as a 128-B.  See Vallery v. Botkin, No. 2:20-cv-0767
23    TLN KJN P, 2020 WL 7425343, at *3–4 (E.D. Cal. Dec. 18, 2020), report and recommendation
adopted, No. 2:20-cv-0767 TLN KJN, 2021 WL 843614 (E.D. Cal. Mar. 5, 2021).
24
[5]  The cases cited by defendant are consistent with this principle.  None involved harms separate
25    and apart from the counseling chrono itself.  See Vallery, 2020 WL 7425343, at *4-5; Heilman,
26    2018 WL 2588900, at *11 (finding the "lack of concrete harm—whether threatened or
immediate—undermines the allegation that the [Counseling] Chronos were adverse actions.");
27    Martin v. Desha, No. 1:16-cv-1353 AWI MJS PC, 2017 WL 1354140, at *2 (E.D. Cal. Apr. 13,
2017) ("There are no allegations that Plaintiff was disciplined as result of the [Counseling]
28    Chrono, or that any kind of negative result has occurred because of the [Counseling] Chrono.").

1    Here, there is no dispute that defendant issued a Counseling Only RVR to plaintiff, and

2    that no formal disciplinary action was taken as a result.  (See Declaration of M. Ingram ("Ingram

3    Decl."), Exh. B, ECF No. 58-4 at 15-17; Pltf. Dep. 62:21-22, ECF No. 58-8 at 28 (acknowledging

4    chrono was a "128A" without punishment).)  Thus, the counseling chrono itself is not an adverse

5    action.  See Vallery, 2020 WL 7425343, *5 (counseling chrono that was "informational only with

6    no disciplinary effect" was not adverse action).  This is the case even if, as plaintiff alleges, the

7    counseling chrono was false.  See Arrant v. Zambrano, No. 3:20-cv-1220 JLS AGS, 2020 WL

8    5408211, at *4 (S.D. Cal. Sept. 9, 2020) (finding no adverse action where alleged falsified RVR

9    "was dismissed as counseling").

10    The burden then shifts to plaintiff to show that the counseling chrono caused some other

11    harm.  Plaintiff argues the counseling chrono made him ineligible to remain in E 302A and

12    triggered his transfer four days later.  Through his own testimony and the supporting declarations

13    of five inmates, plaintiff claims that the E 302A unit – also known as "E2A" – was "honor

14    housing" for inmates with good behavior.  As one declarant explained:

15        Before and on "August 04, 2019" and "August 08, 2019," our facility "E" E2A-
16        housing unit was ran and operated as a "HONOR HOUSING UNIT" by
        [defendant], and if any inmate received a CDCR-115 disciplinary [RVR] guilty
        finding one year prior to moving into E2A-housing unit, or while housed in E2A,
17        the inmate(s) were moved and transferred to other housing units accordingly.

18    (Declaration of R. Scott ("Scott Decl.") ¶ 2, ECF No. 74 at 10; see also Declaration of W.

19    Richardson, ¶ 2, ECF No. 74 at 13 (stating that he witnessed several inmates get moved from

20    E2A for CDCR-115 disciplinary violations).)

21    But as defendant counters on reply (ECF No. 79 at 3), the fault in plaintiff's argument is

22    that she did not issue him formal discipline.  Plaintiff and each declarant testify that removal from

23    E 302A was triggered by a "CDCR-115," which, under the CDCR regulations, is "used by prison

24    officials to report 'misconduct [which] is believed to be a violation of law or is not minor in

25    nature'" and "initiates the prison disciplinary process."  David v. Giurbino, 488 F. Supp. 2d 1048,

26    1052 n.2 (S.D. Cal. 2007) (quoting Cal. Code Regs., tit. 15, § 3312(a)(3)).  As discussed above,

27    defendant issued a counseling chrono pursuant to a different regulation, § 3312(a)(2), that

28    contemplates only "minor misconduct" and is documented on form 128A.  Thus, even accepting

13

1  as true that the E 302A unit was "honor housing" and drawing all reasonable inferences from

2  plaintiff's evidence in his favor, there is no evidence that plaintiff received a CDCR-115.[6]

3  Plaintiff has put forth no other evidence linking the counseling chrono to his housing transfer.

4      Plaintiff further alleges that the counseling chrono issued by defendant had an adverse

5  impact on his July 2021 parole hearing.  (See ECF No. 48 at 3-4.)  Defendant counters that any

6  impact on a parole hearing conducted nearly two years later is too speculative to constitute an

7  adverse action.  (ECF No. 58 at 15-16.)  This is generally the case, as otherwise "[a]ll prisoners

8  who are eligible for parole would have an adverse act whenever a [Counseling] Chrono was

9  filed."  Martin, 2017 WL 1354140, at *2 n.1.  Here, after reviewing the transcript of plaintiff's

10  July 2021 parole hearing (ECF No. 55 at 114-199), the court finds that no reasonable trier of fact

11  could conclude the counseling chrono was a determinative factor in the board's decision.  The

12  board mentions the counseling chrono once at the end of the hearing when recounting plaintiff's

13  prison disciplinary history (id. at 194), but based its parole denial on other factors, namely the

14  nature of his crime and a "woefully lacking" understanding of his criminal actions (id. at 191-

15  193).

16      In sum, because the counseling chrono issued by defendant was purely informational and

17  there is no evidence that it contributed to plaintiff's housing reassignment or adversely affected

18  his parole eligibility, plaintiff has not established its issuance was an adverse action.  The court

19  recommends that summary judgment be granted to defendant as to this claim.

20      **B.  Housing Reassignment**

21      Defendant also moves for summary judgment on plaintiff's claim premised on the alleged

22  retaliatory housing reassignment.  Before addressing the retaliation elements, the court will

23  consider defendant's argument that plaintiff cannot establish causation under 42 U.S.C. § 1983

24  because she did not personally participate in the bed move.  (ECF No. 58 at 20.)

25      To state a claim under 42 U.S.C. § 1983, a plaintiff must show that (1) a defendant acting

26  

27  [6]  It is unlikely that plaintiff was mistaken or confused.  In his deposition testimony, plaintiff
acknowledged he received only a counseling chrono and discussed at length the consequences of

28  "128As" versus "115s."  (See Pltf. Dep. 62:21-25, 63:1-4, ECF No. 58-8 at 28-29.)

1   under color of state law (2) deprived plaintiff of rights secured by the Constitution or federal

2   statutes.  Benavidez v. County of San Diego, 993 F.3d 1134, 1144 (9th Cir. 2021).  "A person

3   'subjects' another to the deprivation of a constitutional right, within the meaning of Section 1983,

4   if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act

5   which he is legally required to do that causes the deprivation of which complaint is made."

6   Murguia v. Langdon, 61 F.4th 1096, 1107 (9th Cir. 2023) (quoting Johnson v. Duffy, 588 F.2d

7   740, 743 (9th Cir. 1978)).  "The requisite causal connection can be established not only by some

8   kind of direct personal participation in the deprivation, but also by setting in motion a series of

9   acts by others which the actor knows or reasonably should know would cause others to inflict the

10  constitutional injury."  Id. (quoting Johnson, 588 F.2d at 743-44.)

11          Defendant has met her initial burden on the issue of causation.  The evidence shows that

12  plaintiff's transfer was initiated by a C/O D.  Yang due to concerns with another prisoner's

13  compatibility issues, and that defendant did not direct or ask Yang to move plaintiff.[7]

14  (Declaration of C/O Yang ("Yang Decl.") ¶ 5, Exh. B, ECF No. 58-5 at 3, 8.)  C/O Nine placed

15  the bed move order at C/O Yang's request.  (Declaration of C/O P. Nine ("Nine Decl.") ¶¶ 2-3,

16  ECF No. 58-6 at 2; see also Declaration of Sgt. Valencia ¶ 2 (stating that he reviewed and

17  approved the bed request made by C/O Nine).)  C/O Nine also states that he never received an

18  order or request from defendant to move plaintiff.  (Nine Decl. ¶ 3, ECF NO. 58-6 at 2.)

19  Defendant disclaims any involvement in plaintiff's transfer and was not aware of its

20  circumstances until reading the above declarations.  (Ingram Decl. ¶¶ 19-23, ECF 58-4 at 5-7.)

21          The burden then shifts to plaintiff.  In his opposition, plaintiff claims the "flip flop"

22  explanation for his transfer is a conspiracy to cover up defendant's involvement.  (See ECF No.

23  74 at 4-5.)  He claims, in essence, that it is too much of a coincidence that he was reassigned just

24  four days after defendant threatened to move him.  As he explained at his deposition:

25          Q.      Would your opinion [of defendant's liability] change if you knew that
                    Officer Ingram didn't move your bed, that she didn't actually take any
26                  action to move your bed?

27  _____

28  [7]  The form lists "racial balance" as the reason for Yang's request.  (Yang Decl., Exh. C, ECF
    No. 58-5 at 10.)  Yang claims this entry was "inadvertently made."  (Id. ¶ 4, ECF No. 58-5 at 4.)

A.    Well, I would beg to differ about that because she told me exactly what she was going to do. And the result happened exactly like she said four days later.  So whenever the buck was laid or lie, or who did what, somebody else different, I knew what Ingram told me. And that's exactly what happened.

(Pltf. Dep. 107:19-25, 108:1-2, ECF No. 58-8 at 40-41.)  When defense counsel pressed for evidence, plaintiff said defendant signed his bed movement order.  (Id. 108:3-5, ECF No. 58-8 at 41.)  But plaintiff did not submit any bed movement orders, and the bed movement documents submitted by defendant show that C/O Nine made the request and Sgt. Valencia approved it.  (See Nine Decl., Exh. A, ECF No. 58-6 at 5.)  Plaintiff has not put forth any evidence of defendant's personal involvement in his bed move, and the court finds none in the record.

The timing between plaintiff's protected conduct and his housing reassignment – a mere four days – does give the court significant pause.  See Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995) ("timing can properly be considered as circumstantial evidence of retaliatory intent.")  But without evidence linking defendant to the subsequent transfer, its temporal proximity to plaintiff's protected conduct alone is not sufficient to create a triable issue of fact.  "A retaliation claim cannot rest on the logical fallacy of post hoc, ergo propter hoc, literally, 'after this, therefore because of this.'"  Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000); see also Wood v. Yordy, 753 F.3d 899, 905 (9th Cir. 2014) ("[M]ere speculation that defendants acted out of retaliation is not sufficient.").[8]

Moreover, plaintiff has presented no evidence upon which the finder of fact could reasonably infer that defendant "set[] in motion the series of acts" by C/Os Yang and Nine that resulted in plaintiff's rehousing, either through her counseling chrono or otherwise.  See Johnson, 588 F.2d at 743-44.  Because plaintiff's retaliatory bed reassignment theory fails for lack of § 1983 causation, summary judgment should be granted to defendant as to this claim.

---

[8]  In cases where courts have drawn inferences of retaliatory motive from the suspect timing of a threat, there was no question as to the defendant's personal participation in carrying out the threat. For example, in Bruce v. Ylst, 351 F.3d 1283, 1289 (9th Cir. 2003), the Court denied defendant's motion for summary judgment where the defendant threatened to validate plaintiff as a gang member and allegedly did so shortly after plaintiff filed a grievance.  Here, despite defendant's threat to move plaintiff, there is no evidence tying her to the subsequent transfer four days later.

**C.  Defendant's Alleged Threat to Transfer Plaintiff**

Although there is no triable issue as to defendant's participation in plaintiff's transfer, her alleged threat to reassign him may constitute unlawful retaliation on its own.  See Gomez, 255 F.3d at 1127-28 (holding prison official violated plaintiff's First Amendment rights by threatening to transfer him because of his complaints, even though the transfer never occurred). "The mere *threat* of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect."  Brodheim, 584 F.3d at 1270 (emphasis in original). "The power of a threat lies not in any negative actions eventually taken, but in the apprehension it creates in the recipient of the threat."  Id. at 1271.  The threshold question in determining an adverse threat is whether "the record, taken in the light most favorable to the plaintiff, reveals statements by the defendant that a reasonable factfinder could ... interpret as intimating that some form of punishment or adverse regulatory action would follow."  Id. at 1270 (citation omitted).

Here, the parties genuinely dispute whether defendant threatened to move plaintiff. (Compare Ingram Decl. ¶ 9, ECF No. 58-4 at 3 ("I did not threaten to move Taylor from my unit during the incident"), with Ervin Decl., ECF No. 74 at 8 ("[Defendant] stated she's not mailing shit out and she will move him out of his bunk").)  Even assuming she made the threat, defendant argues it was not an adverse action because there is no evidence that she said she would move plaintiff "to a bed assignment in a worse housing unit or a housing unit with different privileges." (ECF No. 79 at 5.)  She denies that E 302 was "an honors unit": "CDCR did not classify it as such, and there were no differences in custody levels or privileges between the units."  (Id.)

Viewing the evidence in a light favorable to plaintiff, the court finds it is reasonable to infer that, in the moment, plaintiff believed the threatened transfer would be detrimental to him. The parties genuinely dispute whether E 302A was an honors unit, and plaintiff offers evidence that it was his preferred unit because of positive companionship and other perceived perks:

> [E 302A] dorm was -- had basically elders in it, no problems, people real sick. You know, you didn't have no confrontations, like all the youngsters and stuff, and a bunch problems.  So it was the best dorm to be in to have no problems and to get parole. Because people in there was trying to strive to do the right thing, rehabilitate themselves, attend the programs to rehabilitate themselves, without all the gang stuff, where all the prison politics and all that. It wasn't in there.

1  (Pltf. Dep. 45:3-11.)[9]  Further, although defendant denies any authority to move inmates (Ingram

2  Decl. ¶ 21, ECF No. 58-4 at 6), plaintiff alleges that she ran the unit (see Scott Decl. ¶ 2, ECF No.

3  74 at 10 (E2A was an honor unit "ran and operated" by defendant)) and was its only "housing

4  officer" since he arrived a year prior (Pltf. Decl. 39:4-6).  Drawing the reasonable inferences that

5  E 302A was preferential housing and defendant had the authority to move plaintiff, a factfinder

6  could interpret defendant's threat as intimating an adverse transfer would follow.  Thus, plaintiff

7  has established genuine issues of material fact regarding the adverse action element.

8       The second and third elements, which require a showing that plaintiff's protected conduct

9  was a "'substantial' or 'motivating' factor" for the alleged retaliatory action, are met here.  See

10  Brodheim, 584 F.3d at 1271 (quoting Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th

11  Cir. 1989)).  The evidence allows for the reasonable inference that defendant had firsthand

12  knowledge of plaintiff's protected conduct and threatened to move him in direct response.  (See

13  Dubuisson Decl. ¶ 6, ECF No. 58-3 at 2 ("While I was present, which was for most of the

14  argument, I heard Taylor threaten to file a grievance against Ingram for failing to process his

15  mail"); Ervin Decl., ECF No. 74 at 8 (defendant said she would move plaintiff's bunk after he

16  said he would "write her up for not doing her job").)  The court also infers retaliatory motive from

17  the contemporaneous nature of the parties' alleged statements during a heated argument.  See

18  McCollum v. California Dep't of Corr. & Rehab., 647 F.3d 870, 882 (9th Cir. 2011)

19  (circumstantial evidence of retaliatory intent includes "proximity in time between protected

20  speech and the alleged retaliation.") (citation omitted).

21       The fourth element requires plaintiff to establish that the "official's acts would chill or

---

9  The case defendant cites for support, Singh v. Washburn, No. 2:14-CV-1477 SB, 2020 WL
7049552 (D. Or. Nov. 30, 2020), is distinguishable.  (ECF No. 79 at 5.)  There, the court found
defendant's threatened transfer was not adverse in part because plaintiff disliked his existing unit:

> Even if a factual dispute exists about Pedro's alleged threat to move Singh, a
> move from the open bay mini-dorm, *about which Singh consistently complained*,
> to a cell within the same honor housing unit, would not chill or silence an
> individual of ordinary firmness from engaging in future First Amendment
> activities.

Id. at *21 (emphasis added).

18

1    silence a person of ordinary firmness from future First Amendment activities." <u>Rhodes</u>, 408 F.3d

2    at 568 (internal quotation marks and emphasis omitted).  As with the adverse action analysis,

3    *supra*, the court finds that a reasonable person may have been chilled by defendant's alleged

4    threat to remove plaintiff from his preferred housing.  <u>See id.</u> at 567-68 n.11 ("[H]arm that is

5    more than minimal will almost always have a chilling effect.").

6           The final element requires plaintiff to show the challenged action "did not reasonably

7    advance a legitimate correctional goal."  <u>Rhodes</u>, 408 F.3d at 559.  Defendant denies making the

8    threat and thus does not – and probably could not – proffer a justification for it.  <u>See</u> <u>Entler</u>, 872

9    F.3d at 1041 (punishment for filing grievances lacked any "valid, rational connection" to the

10   government's stated interest); <u>Brodheim</u>, 584 F.3d at 1274 (Bea, J., concurring) (explaining that

11   the majority's discussion of other legitimate penological interests was superfluous because "there

12   is no legitimate penological interest in warning prisoners not to file grievances").  Even assuming

13   defendant had a legitimate interest in maintaining prison order and rehabilitating behavior, <u>see</u>

14   ECF No. 58 at 17-18, the fact she issued a counseling chrono for "disrespect" after the altercation

15   shows that she had other tools at her disposal to achieve those ends.  <u>See</u> <u>B</u>rodheim, 584 F.3d at

16   1272 (instructing courts to consider whether there are "ready alternatives available to the prison

17   for achieving the governmental objectives" (internal quotation marks omitted)).

18          Accordingly, the court finds that there are genuine issues of material fact that preclude

19   summary judgment on defendant's alleged threat to reassign plaintiff.

20   **IV.    Qualified Immunity**

21          Finally, defendant argues she is entitled to qualified immunity.  "In § 1983 actions,

22   qualified immunity protects government officials from liability for civil damages insofar as their

23   conduct does not violate clearly established statutory or constitutional rights of which a

24   reasonable person would have known."  <u>Sampson v. Cnty. of Los Angeles</u>, 974 F.3d 1012, 1018

25   (9th Cir. 2020).  In resolving qualified immunity at summary judgment, courts engage in a two-

26   pronged inquiry.  The first asks whether the facts, viewed in the light most favorable to the

27   plaintiff, demonstrate the officials violated a constitutional right.  The second asks whether that

28   right was "clearly established" at the time of the alleged constitutional violation.  <u>Peck v.</u>

1    Montoya, 51 F.4th 877, 887 (9th Cir. 2022) (citing Tolan v. Cotton, 572 U.S. 650, 655-56 (9th

2    Cir. 2014) (per curiam)).

3           Because the court recommends defendant's motion be granted as to the alleged retaliatory

4    counseling chrono and bed reassignment, it need not address qualified immunity as to those

5    claims.  Turning to defendant's alleged threat, as discussed above, the parties' evidence presents

6    genuine issues of material fact as to whether it was sufficiently adverse to violate plaintiff's First

7    Amendment rights.  Further, in the prison context, the "prohibition against retaliatory punishment

8    is 'clearly established law' in the Ninth Circuit for qualified immunity purposes."  Chavez v.

9    Robinson, 12 F.4th 978, 1001 (9th Cir. 2021) (quoting Pratt, 65 F.3d at 806); see also Entler, 872

10   F.3d at 1042-43 (denying qualified immunity to prison officials who allegedly retaliated against

11   an inmate who filed administrative complaints and threatened to file a civil lawsuit).  The specific

12   prohibition against retaliatory threats of transfer is also clearly established in the Ninth Circuit.

13   See Harbridge v. Reed, 2024 WL 4719083, at *2 (9th Cir. 2024) (mem. op.) (citing Gomez for

14   proposition that, at the time of the retaliatory conduct, "it was clearly established that prison

15   officials may not explicitly threaten to transfer a prisoner in retaliation for their First Amendment

16   protected activities").  Therefore, defendants are not entitled to summary judgment on qualified

17   immunity grounds.

18                                    **CONCLUSION**

19          Accordingly, IT IS HEREBY RECOMMENDED that:

20          Defendant's motion for summary judgment (ECF No. 58) be granted in part and denied in

21   part as follows:

22                a.   Defendant's motion be granted as to plaintiff's retaliation claims premised on the

23                     alleged retaliatory Counseling Only RVR and housing reassignment; and

24                b.   Defendant's motion be denied as to plaintiff's retaliation claim premised on

25                     defendant's alleged retaliatory threat to reassign plaintiff's housing.

26          These findings and recommendations are submitted to the United States District Judge

27   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

28   after being served with these findings and recommendations, any party may file written

                                            20

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 14, 2025

SEAN C. RIORDAN
UNITED STATES MAGISTRATE JUDGE